IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CORONE REID, et al.          :          CIVIL ACTION
                             :
          v.                 :
                             :
TEMPLE UNIVERSITY HOSPITAL   :          NO. 17-2197
EPISCOPAL CAMPUS, et al.     :

MEMORANDUM

Bartle, J.                                    November 6, 2017

Plaintiffs Corone Reid and Donny Odey commenced this action against defendants Temple University Hospital Episcopal Campus ("Episcopal"), Temple University Health System, Inc. ("TUHS"), Temple University ("TU"), and six individuals employed by Episcopal: (1) Chief Medical Officer William Dubin; (2) Unit Director Pedro Miazzo; (3) Director of Nursing Barbara Gennello; (4) Nurse Manager Eric Dutko; (5) Assistant Hospital Director of Human Resources Clara Galati; and (6) Nurse Manager Yasser Al-Khatib. Specifically, plaintiffs have asserted the following causes of action:

- Count I: Discrimination under 42 U.S.C. § 1981 on behalf of Reid against defendants Episcopal, TUHS, TU, Dubin, Miazzo, Gennello, Dutko, and Galati.

- Count II: Retaliation under the False Claims Act, 31 U.S.C. § 3730(h) on behalf of Reid against defendants Episcopal, TUHS, TU, Dubin, Miazzo, Gennello, Dutko, and Galati.

- Count III: Common law breach of fiduciary duty claim on behalf of Reid against defendants

Episcopal, TUHS, TU, Dubin, Miazzo, Gennello, Dutko, and Galati.

- Count IV: Discrimination under 42 U.S.C. § 1981 on behalf of Odey against defendants Episcopal, TUHS, TU, and Al-Khatib.

Plaintiffs seek back and front pay, compensatory and punitive damages, attorneys' fees and costs, and any other appropriate form of relief.

Before the court is the partial motion of defendants to dismiss the amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

I.

When deciding a Rule 12(b)(6) motion, the court must accept as true all factual allegations in the complaint and draw all inferences in the light most favorable to the plaintiff. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008). We must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim must do more than raise a "mere possibility of misconduct." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) (quoting Iqbal, 556 U.S. at 679). Under this standard, "[t]hreadbare recitals

of the elements of a cause of action, supported by mere
conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.
On a motion to dismiss for failure to state a claim, the court
may consider "allegations contained in the complaint, exhibits
attached to the complaint, and matters of public record."
Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,
998 F.2d 1192, 1196 (3d Cir. 1993) (citing 5A Charles Allen
Wright & Arthur R. Miller, Federal Practice and Procedure § 1357
(2d ed. 1990)).

## II.

    The following facts from plaintiffs' amended complaint
and its attached exhibits are taken as true for present
purposes.  Plaintiff Reid is a black woman of Jamaican national
origin who was employed as a registered nurse at Episcopal from
2007 through November 2015.  During her tenure at Episcopal,
Reid received positive performance reviews and had no prior
history of discipline.  Reid states that she was a strenuous
advocate for patient rights as well as the rights of fellow
staff.  Consequently, she regularly made both formal and
informal complaints regarding what she perceived to be negligent
or substandard patient care and working conditions at Episcopal.
According to Reid, her relationship with upper management
steadily declined over time due to the continuous stream of
notices she sent regarding Episcopal's failure to comply with

its own policies and to maintain adequate conditions for patients and staff.

In particular, Reid became increasingly concerned with Episcopal's failure to implement properly its Treatment Plan and Review Policy ("TPARP"), which governed the process and substance related to patient treatment plans. According to Reid, defendants Dubin and Miazzo breached the TPARP by failing to participate in TPARP meetings and by delegating the performance of their duties under the TPARP to other staff. Reid also alleges that it was a common practice to backfill the forms required under the TPARP by filling in patient information at the time of release, which in many cases occurred days or even months after the form should have been completed. As a result, patients received services that were not medically necessary or appropriate, including improper medication. The failure to implement the TPARP increased the duration of patient stays and the frequency of patient readmissions, which in turn allegedly led to increased revenue for Episcopal.

The amended complaint together with its attached exhibits details the events leading up to Reid's termination. While working a night shift on November 4, 2015, Reid became aware of a patient who she believed needed medication to stop itching. Benadryl had already been ordered for this patient for another purpose, but administration of the drug for a new

purpose required a physician's approval.  At Reid's request,
another nurse who was working with Reid telephoned the resident
psychiatrist on call to request permission to administer
Benadryl for the patient's itching.  According to that nurse,
the resident stated:  "OK, and I will be up there later."  After
the nurse conveyed this information, Reid administered the
Benadryl to the patient.

The resident's version of this telephone call differs.
The resident states she was informed on the call that Benadryl
had already been administered for the patient's itching and was
asked to put in an order for the medication.  The resident
replied that she would have to come to the unit to examine the
patient.  After doing so, the resident determined that
administration of Benadryl for the itching was not warranted and
refused to enter an order for the medication.  The resident
claims that Reid then became irate, raised her voice, and
attempted to intimidate her.

The resident reported this incident to defendant
Dutko.  On November 9, 2015, Dutko called Reid into his office
and informed her that she was being terminated immediately.
Dutko provided Reid with a written statement that identified the
grounds for Reid's termination under Episcopal's Corrective
Act/Discipline Policy as violation of Work Rule 1, which
prohibits physical or verbal abuse of other staff or other

significant unprofessional conduct, and Work Rule 7, which relates to gross neglect of duties.  Both violations are grounds for immediate discharge under the policy.  Reid's union submitted a grievance challenging her discharge.  On January 26, 2016, defendant Galati issued a letter denying the grievance. In doing so, Galati cited only Reid's allegedly gross neglect of duties, in violation of Work Rule 7.

Reid then proceeded to arbitration.  After a hearing, the arbitrator concluded that Reid was discharged without just cause in violation of her collective bargaining agreement. Specifically, the arbitrator found that Reid violated Episcopal's Medication Order Policy and Verbal Order/Telephone Policy when she administered the Benadryl to the patient.  Those policies state that "[v]erbal orders are only permissible when a patient requires unanticipated care that should not be delayed until a written order can be obtained."  They also provide that verbal orders may only be given by a resident or fellow to a nurse and that all verbal telephone orders will be documented and read back to the practitioner for confirmation.  The arbitrator reasoned that Reid should not have sought a verbal order to administer the Benadryl because it was not an emergency situation, and that Reid should not have relied on another nurse to speak with the resident.  The arbitrator declined to address the issue of whether Reid had been verbally abusive or

unprofessional with the resident since the hospital had failed to cite that reason in its January 26, 2016 letter denying Reid's grievance.

Although the arbitrator found Reid violated Episcopal policy, he concluded that her termination was not supported by just cause. The arbitrator cited several mitigating factors, including Reid's sincere belief that her actions were in the best interests of the patient, her excellent performance record leading up the night at issue, and the fact that the other nurse involved had received no discipline. In addition, the arbitrator found that Reid was denied due process when Episcopal terminated her without first providing to her an opportunity to respond to the charges. As a result of these findings, the arbitrator ordered Reid reinstated without back pay. Reid declined to return to the position.

Plaintiff Odey is a black man of Nigerian national origin who was employed as a crisis response technician at Episcopal from 2001 through May 2015. Odey's duties included processing patient admissions, performing triage work, and making rounds to check on patients. According to the complaint, Odey's work environment changed dramatically when defendant Al-Khatib, who is of Lebanese ethnicity, became his manager in 2012. Sometime in August or September 2014, Odey became involved in a dispute with another nurse. That nurse called

Odey a "knucklehead, bastard, asshole, African, motherfucker,"
and informed Odey that he was going to make sure Odey was fired
and would "send his black ass back to Africa." Odey reported
the incident to his supervisor, Al-Khatib. Al-Khatib allegedly
responded: "If you don't want to work here any more, there are
many doors and you can walk out. You can walk out any of these
doors, or I am going to do everything within my power to get rid
of you so you can go back to Africa."

A few months later, Odey had a dispute with a fellow
crisis response technician about the procedure for handling an
involuntary patient admission. The technician reported the
incident to Al-Khatib, who informed Odey that he would be
terminated if he became involved in any other controversy.

On May 28, 2015, Odey was assigned to conduct rounds
at 6:00 p.m. and 6:30 p.m. Odey failed to conduct his 6:00 p.m.
round. At 6:15, Odey reviewed the round sheet and saw that
another technician had initialed next to the 6:00 round.
According to Odey, it was common for technicians to cover for
each other on round duty if the responsible technician was
involved in other work, so Odey took no further action as to the
6:00 p.m. round. Odey then signed his initials next to the
6:30 p.m. round without actually conducting any round check.
Another technician failed to conduct the 7:00 p.m. round check.
During the 7:30 p.m. round check, it was discovered that a

patient was missing and had left the premises at 5:40 p.m. by slipping out a door behind a hospital secretary. As a result of this incident, Odey was immediately terminated. The two other technicians involved, who were African-American, were not disciplined. The secretary who failed to notice the patient leaving the building and who is Caucasian also was not disciplined.

III.

As an initial matter, defendant TU asserts that all claims against it should be dismissed because plaintiffs have not alleged any factual content that would allow the court to draw the reasonable inference that TU is in any way involved in the conduct at issue in this matter. Plaintiffs have not opposed the motion to dismiss TU.

Accordingly, the motion to dismiss TU from this action will be granted.

IV.

Defendants Episcopal, TUHS, Dubin, Miazzo, Gennello, Dutko, and Galati assert that Reid's claim in Count II of the amended complaint for retaliation under the False Claims Act, 31 U.S.C. § 3730(h), should be dismissed. Section 3730(h)(1) states:

> Any employee, contractor, or agent shall be
> entitled to all relief necessary to make
> that employee, contractor, or agent whole,

-9-

if that employee, contractor, or agent is
discharged, demoted, suspended, threatened,
harassed, or in any other manner
discriminated against in the terms and
conditions of employment because of lawful
acts done by the employee, contractor, agent
or associated others in furtherance of an
action under this section or other efforts
to stop 1 or more violations of this
subchapter.

This "whistleblower" provision protects employees who assist the government in prosecuting and investigating False Claims Act violations. Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 185-86 (3d Cir. 2001). A plaintiff asserting a cause of action under § 3730(h) must plead that: (1) she engaged in protected conduct, i.e. lawful acts to investigate, prepare, or otherwise pursue a qui tam action or lawful acts to stop violations of the False Claims Act; and (2) that she was discriminated against because of her protected conduct. Id. at 186. To establish that she was discriminated against because of her protected conduct, a plaintiff must allege that: (1) the employer had knowledge of the protected conduct; and (2) the employer's retaliation was motivated, at least in part, by the employee's engagement in the protected conduct. Id.

This knowledge prong requires that the employee put the employer on notice of the "distinct possibility" of False Claims Act litigation. Hutchins, 253 F.3d at 188. Notice to an employer of the "distinct possibility" of litigation is

essential because without knowledge that an employee is contemplating a False Claims Act suit, there would be no basis to conclude that the employer acted out of a desire to retaliate. Id. Mere complaints about job dissatisfaction or regulatory violations generally are not sufficient to put the employer on notice. Id. (citing U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 743 (D.C. Cir. 1998)). Instead, the notice must be sufficient for the employer reasonably to fear that the employee is contemplating filing a False Claims Act action or reporting the employer to the government for fraud. Id. (citing Mann v. Olsten Certified Healthcare Corp., 49 F. Supp. 2d 1307, 1314 (M.D. Ala. 1999)).

The allegations set forth by Reid are similar to those made by the plaintiff in United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523 (10th Cir. 1996), a case previously cited with approval by our Court of Appeals. See Hutchins, 253 F.3d at 191-92. In Ramseyer, the Court of Appeals for the Tenth Circuit found that the plaintiff, who was a clinical director of a mental health facility whose responsibilities included monitoring compliance with Medicaid regulations, did not allege sufficiently that she was terminated in retaliation for engagement in protected activity under § 3730(h). 90 F.3d at 1523. The court reasoned that the plaintiff's reports to supervisors that the facility was not

-11-

complying with various Medicaid regulations, without more, did

not put defendants on notice of a potential qui tam suit.  Id.

The court stated:

> [P]laintiff never suggested to defendants
> that she intended to utilize such
> noncompliance in furtherance of an FCA
> action.  Plaintiff gave no suggestion that
> she was going to report such noncompliance
> to government officials, nor did she provide
> any indication that she was contemplating
> her own *qui tam* action.  Rather, the
> monitoring and reporting activities
> described in plaintiff's complaint were
> exactly those activities plaintiff was
> required to undertake in fulfillment of her
> job duties, and plaintiff took no steps to
> put defendants on notice that she was acting
> "in furtherance of" an FCA action—e.g., that
> she was furthering or intending to further
> an FCA action rather than merely warning the
> defendants of the consequences of their
> conduct.

Id. (internal citations omitted).

Even assuming that Reid engaged in protected activity,

we conclude that she has not sufficiently alleged that she put

Episcopal on notice of the "distinct possibility" that she was

either contemplating the filing of a False Claims Act litigation

or the reporting of Episcopal to the government.  See Hutchins,

253 F.3d at 188.  In the amended complaint, Reid states that she

made both formal and informal complaints about deficiencies in

patient care and working conditions at Episcopal.  The vast

majority of her complaints appear to have centered on the

hospital's failure to implement and maintain proper patient

treatment plans under the TPARP, an internal policy for which

she was partly responsible for complying.  These complaints were

not principally framed as concerns of illegal conduct or

government fraud, and thus could not have caused Episcopal to

fear reasonably that Reid was contemplating the filing of False

Claims Act litigation or reporting to the government.[1]

Accordingly, her claim in Count II for retaliation

under the False Claims Act will be dismissed.[2]

V.

Defendants Episcopal, TUHS, Dubin, Miazzo, Gennello,

Dutko, and Galati next challenge Reid's claim in Count III of

the amended complaint for breach of fiduciary duty.  According

to Reid, she and these defendants were engaged in a "joint

venture" to perform their respective duties under the TPARP.

---

1.  Reid's reliance on a recently-decided qui tam action, <u>United
States ex rel. Lokosky v. Acclarent, Inc.</u>, No. 11-11217, 2017
U.S. Dist. LEXIS 152998 (D. Mass. Sept. 20, 2017), does not
change the court's conclusion.  There, the court held that
internal reporting can be sufficient to support a retaliation
action under § 3730(h) "so long as that internal reporting is
tied to false claims for reimbursement."  <u>Id.</u> at *15.  Here, as
discussed above, Reid's complaints regarding Episcopal's failure
to follow internal policies or comply with certain regulations
were not reasonably tied to fraudulent conduct or false claims
and thus were insufficient under § 3730(h).

2.  Since Reid did not seek leave to amend her pleadings in
light of the deficiency identified by defendants, and nothing
presented in the briefs suggests that corrective amendment would
be fruitful, we will dismiss this claim with prejudice.
<u>See</u> <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir.
2002).

Reid asserts that these defendants breached fiduciary duties owed to her because they failed to implement the TRARP and provided substandard service to patients, and because they knowingly terminated her for whistleblowing activities.

To state a claim for breach of fiduciary duty, a plaintiff must first allege that a fiduciary relationship existed between the parties. Health Robotics, LLC v. Bennett, No. 09-CV-0627, 2009 WL 5033966, at *2 (E.D. Pa. Dec. 22, 2009) (citing Basile v. H & R Block, Inc., 761 A.2d 1115, 1119-22 (Pa. 2000)). Reid's allegation that she was owed a fiduciary duty as a result of the parties' participation in a joint venture fails. Under Pennsylvania law, a joint venture requires: (1) contribution to the joint venture by each member; (2) a sharing of profits; (3) right of mutual control over the venture; and (4) a single business transaction rather than a continuing course of business. Id. (citing Snellbaker v. Herrmann, 462 A.2d 713, 718 (Pa. Super. Ct. 1983)). Reid did not share profits with these defendants and did not exercise a mutual right of control over the TRARP. Moreover, her allegations do not relate to a single transaction but rather her continuing course of employment with Episcopal. Thus, she has not adequately pleaded the elements of a joint venture.

Here, Reid was engaged in a typical employer-employee relationship. An employer generally does not owe fiduciary

-14-

duties to its employees.  See Seifert v. Prudential Ins. Co. of Am., No. 13-7637, 2014 WL 2766546, at *8 (E.D. Pa. June 18, 2014).  Reid has not alleged the existence of any other circumstances that would give rise to a fiduciary relationship.

Accordingly, Count III of the amended complaint alleging breach of fiduciary duty will be dismissed.

VI.

Defendants Episcopal, TUHS, Dubin, Miazzo, Gennello, and Galati also move to dismiss Reid's claim of discrimination under 42 U.S.C. § 1981 alleged in Count I of the amended complaint.  To establish a prima facie case of discrimination under § 1981, a plaintiff must allege:  (1) that she is a member of a racial or ethnic minority; (2) that she suffered an adverse employment action; (3) that she was qualified for her position; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination.  Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); Sayed-Aly v. Tommy Gun, Inc., 170 F. Supp. 3d 771, 777 (E.D. Pa. 2016). According to these defendants, Reid has failed to allege sufficiently the fourth element, namely that her termination occurred under circumstances giving rise to an inference of discrimination.

To establish an inference of discrimination, a plaintiff may rely on, among other things, allegations that the

-15-

employer treated more favorably similarly situated persons not within the protected class.  Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 1998).  To be considered similarly situated, comparator employees need not be identically situated, but must be similarly situated in all relevant respects.  Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011).  Factors relevant to the analysis include the employees' job responsibilities, the supervisors and decision-makers involved, and the nature of the misconduct alleged.  Id.  Whether comparators are similarly situated is generally a question of fact for the jury.  Abdul-Latif v. Cty. of Lancaster, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014).

        Here, Reid has alleged various incidents involving residents and other nurses as comparator evidence giving rise to an inference of discrimination.  We agree with the moving defendants that residents have different job responsibilities and supervisors than registered nurses, and therefore are not similarly situated to Reid.  However, in the amended complaint Reid also has alleged several incidents in which Caucasian nurses administered incorrect or inappropriate medications to patients and received no discipline.  Although the amended complaint does not specify the supervisors or decision-makers involved in these incidents, we may reasonably infer that as nurses at Episcopal these individuals would have reported to

-16-

Gennello, the Director of Nursing, and Dutko, the Nurse Manager, as Reid did. We find these allegations are sufficiently similar in relevant aspects to serve as comparator evidence at this stage of the proceedings.

In support of her § 1981 claim, Reid has also pointed to the treatment of the other nurse with whom Reid worked on the evening of her termination. Although that nurse did not actually administer the Benadryl to the patient, she was involved in the process which led to the patient being given medication without a doctor's order. Her conduct arguably violated Episcopal's policy regarding verbal orders, which provides that verbal orders are permissible only in urgent situations and that such orders must be documented and read back to the practitioner for confirmation. That nurse is Asian and received no discipline. To serve as comparator evidence the nurse's conduct need not be identical to that of Reid. See Wilcher, 441 F. App'x at 882. Accordingly, we conclude that Reid's allegations are sufficient to proceed with her claim under § 1981.[3]

---

3. These defendants also assert that this nurse cannot serve as comparator evidence because she did not engage in unprofessional conduct by confronting the resident as Reid did. As discussed above, after Reid filed a grievance defendants upheld Reid's termination under the "gross neglect of duties" violation only. Defendants may not now rely on the abandoned unprofessional conduct charge to establish that the other nurse was not similarly situated.

Defendants Dutko, Gennello, Galati, Miazzo, and Dubin assert that the § 1981 claim should be dismissed as to them because Reid has failed to allege sufficiently that they were personally responsible for any intentional racial discrimination. Dutko is the Nurse Manager who allegedly conducted the investigation of the events that led to Reid's termination and who presented Reid with notice of her termination. Gennello is the Director of Nursing at Episcopal and allegedly was also involved personally in the decision to terminate Reid. These individuals were the supervisors and decision-makers for at least some of the other nurses whom Reid has identified as receiving more favorable treatment. These allegations are sufficient to state a claim under § 1981 against Dutko and Gennello.

However, we agree with the arguments of Galati, Miazzo, and Dubin. As stated above, Galati is the Assistant Hospital Director of Human Resources. The only allegation pertaining to Galati is that she issued the denial of Reid's grievance. In issuing the denial, Galati merely conveyed the hospital's determination. There is no allegation that Galati participated in the initial decision to terminate Reid or otherwise had any interactions with Reid. Although Dubin and Miazzo are named in the heading of Count I, there are no allegations in the body of that count or elsewhere in the

-18-

amended complaint related to their alleged liability for racial discrimination against Reid.

Accordingly, the motion to dismiss Reid's § 1981 claim will be granted as to Galati, Dubin, and Miazzo but denied as to Dutko and Gennello.[4]

## VII.

Finally, defendants Episcopal, TUHS, and Al-Khatib assert that Odey's claim under 42 U.S.C. § 1981 in Count IV of the amended complaint should be dismissed to the extent it includes allegations of national origin discrimination or racially discriminatory termination. These defendants do not seek to dismiss Odey's § 1981 claim to the extent it relates to harassment or hostile work environment given the allegations in the amended complaint of discriminatory statements made by Odey's coworker and supervisor.

Section 1981 prohibits intentional racial discrimination, which includes discrimination against "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." Saint Francis Coll. v. Al-Khazraji,

---

4. Galati, Dubin, and Miazzo are also named as defendants in Reid's claims for retaliation under the False Claims Act and for breach of fiduciary duty. Because we have dismissed these claims in their entirety, dismissal of the § 1981 claim as to these defendants will result in their dismissal from this action in its entirety.

481 U.S. 604, 613 (1987).  It does not prohibit discrimination solely on the basis of national origin.  Id.; see also Bennun v. Rutgers State Univ., 941 F.2d 154, 172 (3d Cir. 1991).  Thus, in Al-Khazraji the Supreme Court held that if the plaintiff could "prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981."  481 U.S. at 613.  Here, Odey has alleged repeatedly in the amended complaint that he was discriminated against "because of his race, color, ethnicity and national origin."  Such claims of national origin discrimination are improper under § 1981.

We now turn to Odey's claim of discriminatory termination based on race, color, and/or ethnicity.  As discussed above, Odey must allege under § 1981 that his termination occurred under circumstances giving rise to an inference of discrimination.  See Jones, 198 F.3d at 410-11. Such an inference can be raised in a number of ways, including by "comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus."  Golod v. Bank of Am. Corp., 403 F. App'x 699, 702 n.2 (3d Cir. 2010).

Here, Odey has alleged evidence of direct racial discrimination in the form of statements made by his supervisor Al-Khatib, an individual of Lebanese ethnicity. In these remarks Al-Khatib threatened to fire Odey and said he would "send his black ass back to Africa." At this stage of the proceedings, these remarks are sufficient to raise an inference of discrimination as to Odey's termination. Accordingly, we need not reach the arguments of these defendants regarding Odey's allegations of comparator evidence in the form of other employees who were involved in the events leading up to Odey's termination but who received no discipline.

Accordingly, the motion to dismiss Odey's § 1981 claim in Count IV will be granted to the extent it seeks dismissal of the claim of national origin discrimination but denied to the extent it challenges Odey's claim for discriminatory termination on the basis of race, color, and/or ethnicity.