```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CORONE REID, et al.              :      CIVIL ACTION
                                 :
          v.                     :
                                 :
TEMPLE UNIVERSITY HOSPITAL       :
INC., et al.                     :      NO. 17-2197
```

MEMORANDUM

Bartle, J.                                    August 15, 2019

Plaintiffs Corone Reid and Donny Odey have sued under 42 U.S.C. § 1981 for racial discrimination in the termination of their employment. Before the court is the motion of defendants Temple University Hospital, Inc. ("TUH"), Erik Dutko, and Barbara Gennello for summary judgment on Reid's claims under Rule 56 of the Federal Rules of Civil Procedure.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of

the nonmoving party.  See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant.  See Anderson, 477 U.S. at 252.  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id.  In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

II

The following facts are undisputed.  Reid is a black Jamaican-born woman who came to the United States approximately thirty years ago.  She has held a Pennsylvania registered nurse ("RN") license since 2001.  RNs do not have the authority under Pennsylvania law to diagnose medical conditions or to prescribe medication.  See 63 Pa. Stat. Ann. § 212(1), 213(a).

Temple hired Reid in 2008 to work as a pool nurse at its Episcopal Campus ("Episcopal").  In 2010, Reid transferred into a full-time staff nurse position working night shifts on an in-patient behavioral health unit known as the Potter Morris

Unit 5 ("PM-5"). Reid reported to the Nurse Manager of PM-5, defendant Erik Dutko ("Dutko"), who was her supervisor from approximately 2013 until Reid's termination in November 2015. Dutko reported to defendant Barbara Gennello ("Gennello"), the Director of Nursing, who in turn reported to the Associate Hospital Director of Nursing.

Reid received good performance reviews during her tenure at Episcopal. In 2014, she received an above-average performance rating of 2.4 out of 3.0 and in 2015 her performance rating increased to 2.5 out of 3.0. Although Reid received discipline for several minor infractions, including attendance issues, photocopying records inappropriately, and using a cellphone in a patient area, she never asserted that those instances of discipline were racially motivated. In January 2012, Reid received a corrective action/disciplinary report from her former nurse supervisor John Modrzynski, who is Caucasian, regarding an allegedly unprofessional interaction with an African-American security guard. As a result of the incident, Reid received an "initial discussion," the lowest level of discipline, for unprofessional conduct. She was ordered to wear her identification badge and to present it to security whenever requested.

Consistent with Pennsylvania law, TUH maintains policies that govern the administration of medication by RNs.

Under TUH policy, RNs are only authorized to administer medication to a patient in accordance with an order issued by a physician. Once a medication is ordered, an RN administers the medication in accordance with that order. Generally, orders must be written and must include the name of the drug, the dosage, the route and frequency of administration, and any other directions required to administer the drug in a safe and effective manner. Such orders are memorialized in the TUH computer system.

TUH also permits oral orders to be given to RNs directly from physicians under certain emergency circumstances. Specifically, TUH policy provides in relevant part:

> It is the policy of Temple University Hospital that a Registered Nurse . . . may only accept verbal orders from a Resident/Fellow or Licensed Independent Practitioner during an emergent or urgent situation based on their scope of practice.
>
> . . . . Face to face verbal orders which are permissible in emergent situations should be repeated back to the physician to ensure accuracy. Verbal telephone orders are only permissible when a patient requires unanticipated care that should not be delayed until a written order can be obtained. It is also the policy of Temple University Hospital that all verbal telephone orders will be documented and read back to the Practitioner for confirmation of order.[1]

---

1. The terms of the TUH policy specifically refer to "verbal" orders, which means "[o]f, relating to, or expressed in words."

The policy further states that the RN will read back to the physician the patient's name, birth date, room number, drug name, and dose to ensure the accuracy of any oral order before administration. The RN must document such order in TUH's computer order entry system and must indicate that the order was read back to the physician. Thereafter, any oral order must be signed by the physician within 24 hours of the time it is given. These requirements concerning oral orders are obviously significant safeguards for TUH patients.

Temple also maintains a corrective action/disciplinary policy that provides for progressive employee discipline. It states in relevant part:

> <u>Behavior Warranting Immediate Discharge</u>:
>
> A. Some infractions are serious and may warrant immediate discharge. Examples of these offenses include but are not limited to the following:
>
>   1. The physical or verbal abuse of patients, visitors, staff, or other employees or any other significant unprofessional conduct.
>
>   . . . .
>
>   7. Gross neglect of duties including but not limited to job abandonment, patient abandonment, or unauthorized sleeping on duty.

---

<u>See</u> Black's Law Dictionary (11th ed. 2019). It is clear that the word "verbal" in the context of this policy means "oral."

>                  . . . .
>
>             B. These are some examples of behaviors that
>                may warrant immediate termination.  There
>                may be other behaviors not listed that
>                also warrant immediate termination.  TUHS
>                reserves the right to terminate the
>                employment of any employee without
>                following the corrective action/discipline
>                steps outlined above if it determines that
>                termination is appropriate and in the best
>                interest of TUHS' operation, unless
>                otherwise prohibited by law or applicable
>                collective bargaining agreement.

On November 4, 2015, Reid and Yolanda Castelo ("Castelo"), an Asian RN, were working on the PM-5 unit from 7:00 p.m. to 7:00 a.m. Sometime between 9:00 p.m. and 10:00 p.m., Reid determined that a patient needed Benadryl administered intramuscularly ("Benadryl IM") based on what she considered to be a rash. According to Reid, she noticed the patient scratching and ripping at his arms and observed bumps and rashes all over his body. She believed the patient was experiencing an allergic reaction to other medication previously administered and feared that the patient would suffer respiratory distress as a result. Temple staff are trained to call a "rapid response" or "STAT 13" in the event of a patient emergency requiring immediate intervention. Reid did not do so. Instead, she instructed Castelo to call the resident on duty and to explain that the patient was already approved for Benadryl for the extrapyramidal ("EPS") indication and that the RNs

wished to have the indication changed in order to use Benadryl IM for the patient's rash. It is conceded that the patient was not suffering from EPS, which is a potentially serious adverse reaction to anti-psychotic medication.

Castelo called as instructed. She then advised Reid that the resident on duty, Katsuko Nagayoshi ("Nagayoshi") had approved the administration of Benadryl IM for the patient's rash. Reid administered the medication. Shortly thereafter, Reid viewed the computer system and noticed that the patient's indication for Benadryl had not been changed. Reid went to the nurses' station where Nagayoshi and Castelo were sitting. Reid stated: "Doc you didn't put in the medication. I already gave the Benadryl." Nagayoshi denied having ever given Castelo approval to administer the Benadryl IM and refused to enter an order in the computer after-the-fact. Reid then asked Castelo in front of Nagayoshi: "Did you not say the doctor said OK to give the medicine and she will put it in," and Castelo responded: "Yes."

Nagayoshi and Reid then went to see the patient. Nagayoshi examined the patient's skin but could not conduct a further assessment because the patient was sleeping. Nagayoshi did not agree that Benadryl IM was warranted for the patient's rash and thus never entered an order for that indication.

On November 5, 2015, Gennello and Timothy Ward ("Ward"), the Associate Hospital Director of Nursing, received an email from the physician overseeing the residency program containing Nagayoshi's report that Reid had administered medication to a patient without an order the previous night. The report also stated that Reid had yelled at Nagayoshi for refusing to enter an order after-the-fact. Ward reached a preliminary decision that Reid's employment should be terminated and conveyed this information to Dutko, her supervisor. Dutko conducted an investigation of the incident. As part of his investigation, he interviewed Nagayoshi, reviewed the patient's records, and reviewed security video of the unit for the time Reid claimed the patient was having a severe allergic reaction.[2] Based on this investigation, TUH's human resources department approved the termination.

A few days later, on November 9, 2015, Reid was called to a meeting with Gennello, Dutko, and representatives from her union. At the conclusion of that meeting, Reid was terminated. During the meeting, TUH provided Reid with a Corrective Action/Discipline Report which stated:

> Ms. Reid administered medication without an order on 11/4/2015. Additionally, Ms. Reid

---

2. Dutko also reports that he attempted to speak with Castelo but that she was absent from work due to a vacation abroad. Castelo did not provide a statement regarding the incident until December 18, 2015.

> engaged in significant unprofessional
> conduct and verbal abuse of another employee
> on 11/4/2015. As pertaining to Work Rules 1
> and 7 those actions warrant immediate
> termination.

Reid's union grieved her termination. Associate Hospital Director of Human Resources Clara Galati ("Galati") heard the grievance on January 6, 2016. Reid was present at the grievance hearing along with a union representative. The union produced a written statement from Castelo stating that Castelo had called Nagayoshi before Reid administered the medication to seek Nagayoshi's permission and Nagayoshi had said "Ok, and I will be up there later." Galati denied the grievance on the basis of Reid's administration of medication without a valid order. Reid did not allege that race played a role in her termination and consequently the grievance did not address this issue.

After the grievance was denied, the union appealed the case to arbitration. The arbitrator found that Reid should be reinstated because TUH's investigation had not afforded her sufficient due process under the collective bargaining agreement. The arbitrator also considered certain mitigating factors, including Reid's prior good performance record and her apparently sincere belief that the medication was necessary to help the patient. However, the arbitrator determined that the reinstatement should be without back pay because Reid had

-9-

violated TUH's medication policies. Reid declined the opportunity to return to work. Again, Reid did not raise any claim of racial discrimination and thus the arbitrator did not opine on this issue.

                                III

> Section 1981 provides in relevant part:
>
> All persons within the jurisdiction of the
> United States shall have the same right in
> every State and Territory to make and
> enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit
> of all laws and proceedings for the security
> of persons and property as is enjoyed by
> white citizens, and shall be subject to like
> punishment, pains, penalties, taxes,
> licenses, and exactions of every kind, and
> to no other.

42 U.S.C. § 1981(a). To establish a prima facie case of discrimination under § 1981, a plaintiff must allege: (1) that she is a member of a racial minority; (2) that she suffered an adverse employment action; (3) that she was qualified for her position; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). "If a plaintiff fails to raise a genuine dispute of material fact as to any of the elements of the prima facie case, she has not met her initial burden, and summary judgment is properly granted for the defendant." Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013).

To establish an inference of discrimination, a plaintiff may rely on, among other things, allegations that the employer treated more favorably similarly situated persons not within the protected class. Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998). To be considered similarly situated, comparator employees need not be identically situated but must be similarly situated in all relevant respects. Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011). Factors relevant to the analysis include the employees' job responsibilities, the supervisors and decision-makers involved, and the nature of the misconduct alleged. Id. Whether comparators are similarly situated is generally a question of fact for the jury. Abdul-Latif v. Cty. of Lancaster, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014). However, summary judgment is appropriate where there is no evidence from which a jury could conclude that the alleged comparators were similarly situated. See Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222-24 (3d Cir. 2009).

There is no dispute that Reid is a member of a racial minority, that she suffered an adverse employment action when she was terminated, and that she was otherwise qualified for her position as an RN. We must only consider whether Reid has raised a genuine dispute of material fact regarding the fourth element of her prima facie case, namely, that her termination

occurred under circumstances giving rise to an inference of discrimination.

Reid does not assert that she administered medication pursuant to a written order by a physician. She also concedes, in violation of TUH's medication policies, that she did not receive any oral order directly from a physician and did not document and read back to the physician the patient's name, birth date, room number, drug name, and dose before administering the medication. Furthermore, although Reid now attempts to characterize the situation as urgent, she admits that she did not call a "rapid response" or "STAT 13" as required under TUH policy in the event of a patient emergency. Thus, even taking Reid's version of the facts as true, as we are required at this stage of the proceedings, Reid administered medication without a valid written or oral order from a physician. Such action constituted a serious breach of TUH policy and exceeded the scope of Reid's RN license under Pennsylvania law.

Reid claims she was acting in accordance with normal practice at the hospital, which is that a charge nurse will ask a physician for an order and if the physician agrees, the medication nurse will administer the medication even if the order has not yet been entered into the computer system. In support of her position, Reid has not produced any evidence that

TUH management was aware of such practice or other nurses employed by TUH regularly engaged in such conduct. While Reid may have disregarded the importance of TUH's oral medication policy, there is no doubt that it is exists to avoid the kind of miscommunication that appears to have occurred here between Reid, Castelo, and Nagayoshi and to protect the well-being of TUH's patients.

Instead, in an attempt to support an inference of discrimination, Reid points to three nurses outside her protected class who she claims engaged in similar conduct but received more favorable treatment: (1) Castelo, the nurse with whom she worked on the night of the incident; (2) Gwendolyn Morris ("Morris"); and (3) Krista Penella ("Penella"). Castelo is an Asian nurse, as discussed above, who was working with Reid on the evening of November 4, 2015 and who told Reid that Nagayoshi had approved the medication. Castelo was not disciplined. Reid asserts that she and Castelo were working as a "team" and therefore should be treated the same. However, it is undisputed that Castelo did not actually administer medication to a patient without a doctor's valid order and thus did not breach TUH's medication policy. Accordingly, she is not similarly situated and TUH's failure to discipline Castelo does not support an inference that Reid's termination was racially motivated.

Morris is a Caucasian nurse who accidentally administered a properly prescribed dose of methadone to the wrong patient in 2014. This mishap resulted in the patient overdosing and needing to be transferred to the intensive care unit. Morris received an initial discussion corrective action/discipline report, which stated that Morris would be required to review TUH's medication policy and to collaborate with other colleagues to avoid future mistakes.

Penella is a Caucasian nurse who administered a medication to a patient pursuant to a physician's order without realizing that the physician had written the order for the wrong patient. On another occasion, Penella administered medication as ordered by a physician but, according to Reid, the medication prescribed by the physician was inappropriate and dangerous for the patient.

Both Morris and Penella committed medication errors. However, their conduct was accidental and thus quite different from that of Reid. She intentionally violated TUH's medication policies as well as the scope of her RN license under Pennsylvania law by administering medication without a valid physician's order.

Reid also points to Barbara Loughrey ("Loughry") as a comparator. Loughery, who is Caucasian, was a former assistant manager of the emergency department at Episcopal who allegedly

altered patient records in an attempt to have another nurse disciplined. Loughrey resigned after a group of nurses petitioned the administration for her removal. Loughrey held a different position than Reid and engaged in completely different conduct than Reid. Accordingly, it is not appropriate to consider her as a comparator.[3] Reid has not produced any other evidence to support an inference of discrimination and thus she has failed to produce evidence of her prima facia case sufficient to defeat summary judgment.

Defendants further assert that, even assuming Reid had successfully produced evidence to support her prima facie case, her claim of discrimination would not survive summary judgment because defendants have articulated a legitimate, non-discriminatory reason for the termination and Reid has failed to produce evidence that this reason was pretextual. We agree.

If the plaintiff produces evidence to support a prima facie case, the burden then shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the termination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). To survive summary judgment, the plaintiff

---

3. Reid's co-plaintiff Odey is also not an appropriate comparator. He held a different position in a different unit with a different supervisor and did not engage in similar conduct.

-15-

must then provide evidence "from which a factfinder could either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Simpson, 142 F.3d at 644 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

To establish pretext under the first approach, a plaintiff cannot simply show the employer's decision was wrong or mistaken, but rather must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employee's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 764 (emphasis and internal quotations omitted). Thus, Reid must cite evidence to show that the asserted reason "was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997). The second method for establishing pretext involves evidence from which a factfinder could conclude that the adverse employment action was more likely than not the result of discrimination, such as evidence of previous acts of discrimination against the plaintiff or that the employer has treated similarly situated employees outside the plaintiff's class more favorably. See Simpson, 142 F.3d at 644-45.

As stated above, Reid has admitted that she administered medication to a patient without a valid written or oral order as required under TUH policy. Violation of an employer's policy is a legitimate, nondiscriminatory reason for discharge. See, e.g., Raytheon Co. v. Hernandez, 540 U.S. 44, 51-52 (2003); Slater v. Susquehanna Cty., 465 F. App'x 132, 134, 137 (3d Cir. 2012); Parikh v. UPS, 491 F. App'x 303, 305, 307 (3d Cir. 2012). Reid attempts to challenge her termination by claiming that she believed the resident had authorized the medication, that this was an emergency situation in which it was permissible for her to administer the medication, that she was acting to help the patient, that she did not yell at the resident or otherwise engage in unprofessional conduct, and that her actions were common practice and thus were at most a "technical violation" of the policy that did not warrant termination.

To establish pretext, Reid may not "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Keller, 130 F.3d at 1108 (quoting Fuentes, 32 F.3d at 765). The conduct for which Reid was terminated, the administration of medication without a valid written or oral order from a physician, was not only a serious violation of TUH

-17-

policy but also a violation of Pennsylvania law.  Under the corrective action/discipline policy, TUH reserved the right to terminate an employee immediately if it determined that termination is appropriate and in the best interests of TUH.  Accordingly, Reid's disagreement with TUH's decision to terminate her immediately does not establish that TUH's proffered rationale is untrue or that invidious discrimination was more likely than not the motivating factor.

Reid also points to deficiencies in TUH's investigation leading to her termination as evidence of pretext.  Specifically, Reid asserts that TUH's investigation was unfair or inadequate because Dutko failed to speak to her before the termination meeting and therefore she had no opportunity to tell her side of the story and because Castelo was not interviewed before the termination.  Evidence that an employer's investigation was inadequate is insufficient to establish pretext in discrimination cases.  See, e.g., Money v. Provident Mutual Life Ins. Co., 189 F. App'x 114, 116-17 (3d Cir. 2006); Geddis v. Univ. of Delaware, 40 F. Appx' 650, 653-54 (3d Cir. 2002); Bloch v. Mack Trucks, Inc., 240 F. Supp. 3d 365, 375 (E.D. Pa. 2017).  An inadequate investigation may infringe Reid's rights under her collective bargaining agreement or possibly her procedural due process rights but would have no bearing on whether defendants acted with discriminatory intent.

Again, Reid does not dispute that she violated both TUH's medication policy and Pennsylvania law, and that TUH reserved the right to terminate immediately an employee for infractions deemed serious. Reid's attacks on the adequacy of the investigation are insufficient to establish pretext.

Nor does the arbitrator's opinion support a finding of pretext. As stated above, since Reid did not raise any claim of racial discrimination at the arbitration, that proceeding did not address the issue currently before this court. While the arbitrator found that TUH committed certain errors in connection with Reid's due process rights under the collective bargaining agreement, he did not find that TUH had engaged in discrimination when it terminated Reid. Nor did the arbitrator rule that Reid did not commit the offense for which she was charged, that is, administration of medication without a doctor's order. Instead, the arbitrator determined that Reid "did violate Employer Policies, resulting in the Patient receiving Benadryl for a reason never authorized by a doctor" and that this was a "serious offense."

Finally, as evidence of pretext, Reid claims she was discriminated against when she was disciplined for a confrontation with an African-American security guard in January 2012. As a result of the incident, Reid received an initial discussion, the least serious type of discipline under TUH

policy, for unprofessional conduct. The associated corrective action/discipline report states:

> On 12/31/11 [at] 7:07 PM someone was exiting the ED door as you walked up. The security officer stopped you as you walked to the rear of the ED to ask if you worked at the hospital and if you could show your ID Badge. You angrily responded, "Get out of here" and refused to show your ID that you were not wearing.

As a result of the incident, Reid was ordered to wear her identification badge and to present it to security when requested. No other action was taken against Reid. This disciplinary report was issued almost three years before Reid's termination, by a different supervisor, and played no role in TUH's decision in 2015 to terminate Reid. She has proffered no evidence that this discipline was motivated by discrimination other than her disagreement with whether it was warranted. Accordingly, the 2012 disciplinary action does not raise a genuine dispute of material fact regarding whether TUH's proffered rationale for Reid's termination was pretextual.

Accordingly, the motion of defendants for summary judgment on Reid's claim of race discrimination under 42 U.S.C. § 1981 will be granted.