```
         IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CORONE REID, et al.            :        CIVIL ACTION
                               :
          v.                   :
                               :
TEMPLE UNIVERSITY HOSPITAL     :
INC., et al.                   :        NO. 17-2197
```

MEMORANDUM

Bartle, J.                                    August 15, 2019

Plaintiffs Corone Reid and Donny Odey ("Odey") have sued under 42 U.S.C. § 1981 for racial discrimination in the termination of their employment. Before the court is the motion of defendants Temple University Hospital, Inc. ("TUH") and Yasser Al-Khatib ("Al-Khatib") for summary judgment on Odey's claims under Rule 56 of the Federal Rules of Civil Procedure.

I

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). We view the facts and draw all inferences in favor of

the nonmoving party. See In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. See Anderson, 477 U.S. at 252. "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." Id. In addition, Rule 56(e)(2) provides "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

II

The following facts are undisputed. Odey is a black man who immigrated to the United States from Nigeria in 1989. He was hired by TUH sometime in 1997 or 1998 as a Crisis Response Technician ("CRT") at the main campus. Odey transferred to TUH's Episcopal Campus ("Episcopal") after two or three years, where he worked in the Crisis Response Center ("CRC"), a treatment unit for patients with short-term acute behavioral health issues. Al-Khatib became Odey's supervisor in 2012. Al-Khatib was born in Lebanon and worked as a nurse manager for TUH. Khatib gave Odey good performance ratings

throughout his time with TUH. In 2012, Odey received a performance rating of 2.12 out of 3.0. In 2013, his performance rating was 2.44 out of 3.0, while in 2014 it was 2.6 out of 3.0.

Sometime in 2014, Odey complained to Al-Khatib about an inappropriate remark made by a white nurse named Bob Hansen ("Hansen"). Hansen had become upset because he believed Odey let a patient into a bathroom where she had been found trying to wash her hair in the sink. Hansen told Odey he was going to write Odey up and send him back to his "African black ass country" and called Odey a "knucklehead." Odey reported this incident to Al-Khatib the next day, and Al-Khatib promised to investigate.

The next day, Al-Khatib called Odey into his office where Hansen was already sitting. According to Odey, Al-Khatib told him "if I don't want to work here no more, there are too many doors there, I can go through any of the doors or he's going to use everything in his power to get rid of me." Al-Khatib warned both men that future misconduct could lead to termination and urged them to work together in a professional manner. Odey does not recall any other problems with Hansen before or after this incident. In October 2014, Al-Khatib terminated Hansen's employment for violating TUH's rules regarding the reporting of arrests.

In January 2015, Odey was involved in an oral confrontation with a fellow CRT named Stephen John ("John"), who Odey describes as being of "East Indian" descent. Odey and John had a dispute regarding patient paperwork, which led to both men raising their voices at each other. Thereafter, Al-Khatib called Odey, John, and their union representative to his office. Al-Khatib did not let Odey explain what had happened and threatened to "get rid" of Odey if he "ever hear[d] anything from [Odey] again or if [Odey] ever [did] anything again." At the conclusion of the meeting, Al-Khatib issued identical "initial discussion" disciplines to both Odey and John, which are the least serious forms of discipline.

On May 28, 2015, an involuntarily committed patient escaped from the CRC by slipping out a door behind the unit secretary at approximately 5:40 p.m. CRTs are required to conduct rounds in the CRC during which they physically observe and record the condition of each patient at 30-minute intervals. Odey was the CRT assigned to conduct the rounds at 6:00 p.m. and 6:30 p.m. Video surveillance of the CRC shows Odey picking up the rounds sheet at approximately 6:10 p.m. and filling out the form for over a minute while standing in an area with no view of patients, and then returning to an internal office with no view of patients until around 7:00 p.m.

At 7:30 p.m., a nurse conducting rounds discovered the patient's absence. He subsequently notified Al-Khatib and the police. Allen Peters ("Peters"), another CRT, had been assigned to conduct the 7:00 p.m. rounds but had failed to do so until after the patient's absence had been discovered during the 7:30 p.m. rounds. Peters subsequently noted a "?" for the missing patient on the 7:00 p.m. rounds sheet.

After reviewing the round sheets and video surveillance of the unit, Al-Khatib called Odey and his union representative to a meeting on June 1, 2015. During that meeting, Odey admitted to falsely certifying that he had conducted the 6:30 p.m. rounds. He further stated that another CRT, Tim Davis ("Davis"), had performed the 6:00 p.m. rounds on behalf of Odey. At the conclusion of the meeting, Al-Khatib terminated Odey's employment for falsification of records.

Al-Khatib separately questioned Davis about the 6:00 p.m. rounds. Davis, who is African-American, provided a written statement that he was discharging a patient and had written "D/C" in the 6:00 p.m. space for that patient and then started initialing the bottom of the column out of habit when Odey had interrupted him. Davis denied completing the entire 6:00 p.m. rounds sheet or otherwise attempting to suggest he had done so. Davis was not disciplined. Peters, who is also African-American, was also considered for termination for his

-5-

actions related to the 7:00 p.m. rounds. The union interceded on Peters' behalf to argue that his conduct was less severe than Odey's because he did not intentionally falsify records but merely failed to conduct his rounds. Peters was ultimately issued a written warning.

The union filed a grievance challenging Odey's termination. After the grievance was denied, the union appealed to arbitration. The arbitrator denied Odey's appeal. He found that TUH had just cause to terminate Odey and the fact that Peters and Davis were not terminated was not evidence of disparate treatment. Neither Odey nor the union raised any issues of race discrimination at the grievance or arbitration.

III

Section 1981 provides in relevant part:

> All persons within the jurisdiction of the
> United States shall have the same right in
> every State and Territory to make and
> enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit
> of all laws and proceedings for the security
> of persons and property as is enjoyed by
> white citizens, and shall be subject to like
> punishment, pains, penalties, taxes,
> licenses, and exactions of every kind, and
> to no other.

42 U.S.C. § 1981(a). Section 1981 prohibits intentional racial discrimination, which includes discrimination against "identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or

-6-

ethnic characteristics." Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987). It does not prohibit discrimination solely on the basis of national origin. Id.; see also Bennun v. Rutgers State Univ., 941 F.2d 154, 172 (3d Cir. 1991). Thus, in Al-Khazraji the Supreme Court held that if the plaintiff could "prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981." 481 U.S. at 613. Here, Odey has alleged repeatedly in the amended complaint that he was discriminated against "because of his race, color, ethnicity and national origin." Such claims of national origin discrimination are improper under § 1981. We therefore will interpret Odey's claims as alleging discrimination on the basis of race, color, and/or ethnicity.

To establish a prima facie case of discrimination under § 1981, a plaintiff must allege: (1) that he is a member of a racial or ethnic minority; (2) that he suffered an adverse employment action; (3) that he was qualified for his position; and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999). "If a plaintiff fails to raise a genuine dispute of material fact as to any of the elements of the prima facie case, [he] has not met

-7-

[his] initial burden, and summary judgment is properly granted for the defendant." Burton v. Teleflex, Inc., 707 F.3d 417, 426 (3d Cir. 2013).

To establish an inference of discrimination, a plaintiff may rely on, among other things, allegations that the employer treated more favorably similarly situated persons not within the protected class or that the employer has discriminated against other persons within the plaintiff's protected class. Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3d Cir. 1998). To be considered similarly situated, comparator employees need not be identically situated but must be similarly situated in all relevant respects. Wilcher v. Postmaster Gen., 441 F. App'x 879, 882 (3d Cir. 2011). Factors relevant to the analysis include the employees' job responsibilities, the supervisors and decision-makers involved, and the nature of the misconduct alleged. Id. Whether comparators are similarly situated is generally a question of fact for the jury. Abdul-Latif v. Cty. of Lancaster, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014). However, summary judgment is appropriate where there is no evidence from which a jury could conclude that the alleged comparators were similarly situated. See Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222-24 (3d Cir. 2009).

Here, there is no dispute that Odey is a member of a racial or ethnic minority, that he suffered an adverse

employment action when he was terminated, and that he was otherwise qualified for his position as a CRT. We must only consider the fourth element of his prima facie case, that is, whether Odey has raised a genuine dispute of material fact that his termination occurred under circumstances giving rise to an inference of discrimination.

Odey admits that he failed to conduct the 6:30 p.m. rounds and that he falsely certified that he had done so. His actions are clearly memorialized in video surveillance submitted by TUH. This conduct contributed to an almost two-hour delay in discovering that a patient, who had been involuntarily committed to the hospital for mental health issues, had escaped. As Odey admitted in his deposition, patient rounds are important to avoid the escape of patients and to ensure patient safety.

Falsifying records is express grounds for immediate termination under TUH disciplinary policy. Specifically, under the heading "Behavior Warranting Immediate Discharge," Temple's disciplinary policy states:

> A. Some infractions are serious and may warrant immediate discharge. Examples of these offenses include but are not limited to the following:
>
>    . . . .
>
>    6. Falsification or misrepresentation or any other unauthorized alteration of information or records.

-9-

A neutral arbitrator found that Odey's termination was proper and that Odey's actions constituted grounds for immediate discharge.

Odey puts forth Davis and Peters as comparators who were treated more favorably for engaging in similar conduct. Davis and Peters are both African-American. They cannot be relied upon by Odey as evidence that individuals outside of the protected class were treated more favorably.[1]

Odey also puts forth Diane Youmans ("Youmans") as a comparator who was treated more favorably. Youmans, who is Caucasian, is the CRC unit secretary who opened the door from which the patient escaped. Youmans received an initial discussion for not ensuring the door had closed behind her. Youmans is not an appropriate comparator with Odey as a matter of law. As a secretary, she is not tasked with caring for patients like a CRT and thus holds a completely different position than he did. See Mandel v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013). Her conduct, which involved

---

1. Odey attempts to distinguish Davis and Peters based on the fact that they are African-American, whereas Odey was born in Africa. This is a national origin claim, which as discussed above is not cognizable under § 1981. See Saint Francis Coll., 481 U.S. at 613; Bennun, 941 F.2d at 172. Odey has produced no evidence that defendants viewed him as having a different race, ancestry, heritage, or distinct ethnic characteristics than Davis and Peters as would be required to support a claim under § 1981.

inadvertently failing to close a door, is clearly not similar to that of Odey, who ignored his responsibilities to check on patients and intentionally falsified records.

Odey points to Al-Khatib's handling of his complaint about Hansen as evidence of discrimination. Odey did not receive any form of formal discipline as a result of the incident with Hansen. Although he claims to have been unhappy with Al-Khatib's handling of the incident, Odey did not report Hansen's comments to human resources or to anyone else in management at TUH. It is undisputed that Odey had no further problems with Hansen and that Hansen was terminated later in October 2014 for unrelated conduct. While Hansen's comments were certainly reprehensible and warranted investigation, they are insufficient to raise an inference that Odey's termination by Al-Khatib at least seven months later was the result of discrimination.

Odey also references his discipline in January 2015 by Al-Khatib stemming from Odey's altercation with John, an employee of East Indian descent. However, Odey has admitted that he likely raised his voice at John. More importantly, Al-Khatib issued both John and Odey the same discipline, an initial discussion. This is the lowest level of discipline under TUH policy. Both disciplines contained identical warnings that the two men must refrain from having altercations with

employees and that failure to do so would result in further disciplinary action.  There is no evidence that Odey was singled out by Al-Khatib or that this incident, which occurred well before Odey's termination, constitutes discrimination by defendants.

Finally, Odey relies on an incident involving three mental health technicians ("MHTs") who were disciplined in 2017 after certifying in rounds that a patient was in her room on their unit when she was actually out of the hospital on a day pass.  All three received suspensions.  Two of these individuals are black, and one is Puerto Rican.  These individuals are not appropriate comparators because the incident that led to their suspensions occurred in 2017, two years after Odey's termination, under a different supervisor and on a different unit.  Moreover, two of these alleged comparators are the same race or ethnicity as Odey.  Accordingly, Odey cannot rely on these individuals to create an inference of discrimination sufficient to defeat summary judgment.

Defendants further assert that, even assuming Odey had successfully produced evidence to support his prima facie case, his claim of discrimination still would not survive summary judgment because defendants have articulated a legitimate, non-discriminatory reason for the termination and Odey has

failed to produce evidence that this reason was pretextual. We agree.

If the plaintiff produces evidence to support a prima facie case, the burden then shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the termination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). To survive summary judgment, the plaintiff must then provide evidence "from which a factfinder could either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Simpson, 142 F.3d at 644 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

To establish pretext under the first approach, a plaintiff cannot simply show the employer's decision was wrong or mistaken, but rather must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 764 (emphasis and internal quotations omitted). Thus, Odey must cite evidence to show that the asserted reason "was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109

-13-

(3d Cir. 1997). The second method for establishing pretext involves evidence from which a factfinder could conclude that the adverse employment action was more likely than not the result of discrimination, such as evidence of previous acts of discrimination against the plaintiff or that the employer has treated similarly situated employees outside the plaintiff's class more favorably. See Simpson, 142 F.3d at 644-45.

Odey has admitted that he failed to conduct the 6:30 p.m. rounds and that he falsely certified that he had done so. As a result, a patient was not promptly discovered missing from TUH. There is clear footage from security cameras showing Odey engaged in this misconduct.[2] Such misbehavior is extremely serious and is an express ground for immediate discharge under TUH's disciplinary policy. Not surprisingly, the arbitrator found that TUH had just cause to terminate Odey.

Odey asserts that TUH's investigation was inadequate because management failed to give him an opportunity to tell his side of the story before his termination. Evidence that an employer's investigation was inadequate is insufficient to establish pretext in discrimination cases. See, e.g., Money v. Provident Mutual Life Ins. Co., 189 F. App'x 114, 116–17

---

2. As noted above, Odey has asserted that he did not falsely certify that he conducted the 6:00 p.m. rounds and that Davis, another CRT, took responsibility for that round. This dispute is irrelevant because false certification of the 6:30 p.m. rounds is sufficient grounds for termination.

-14-

(3d Cir. 2006); <u>Geddis v. Univ. of Delaware</u>, 40 F. App'x 650, 653-54 (3d Cir. 2002); <u>Bloch v. Mack Trucks, Inc.</u>, 240 F. Supp. 3d 365, 375 (E.D. Pa. 2017). To establish pretext a plaintiff may not "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, prudent, or competent." <u>Keller</u>, 130 F.3d at 1108-09 (quoting <u>Fuentes</u>, 32 F.2d at 765). An inadequate investigation may violate Odey's rights under his collective bargaining agreement or possibly his procedural due process rights but would have no bearing on whether defendants acted with discriminatory intent. Regardless, the arbitrator who reviewed Odey's termination found no such violation of Odey's rights under the collective bargaining agreement and upheld his termination. Odey's claims are also belied by his own deposition testimony, in which he stated that he explained during his termination meeting that his conduct had been an "honest mistake."

Because there is no evidence upon which a rational fact-finder could conclude that TUH's true reason for terminating Odey's employment was race discrimination, Odey's discrimination claim under § 1981 fails as a matter of law. Accordingly, the motion of defendants for summary judgment on

Odey's claim for race discrimination under 42 U.S.C. § 1981 will be granted.

IV

Odey alternatively claims that his termination was in retaliation for his complaint about Hansen. To establish a prima facie case of retaliation under § 1981, a plaintiff must show that: (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between his participation in the protected activity and the adverse action. McIntosh v. White Horse Vill., Inc., 249 F. Supp. 3d 796, 800 (E.D. Pa. 2017) (citing Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 257 (3d Cir. 2017)). Causation can be proven "by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive.'" Carvalho-Grevious, 851 F.3d at 259 (internal citations omitted) (quoting Shaner v. Synthes, 204 F.3d 494, 505 (3d Cir. 2000)).

Defendants, for purposes of their summary judgment motion, do not dispute that Odey engaged in protected activity when he complained to Al-Khatib about Hansen's remarks or that he suffered an adverse employment action when he was terminated. Instead, the parties' dispute centers on whether there is a causal connection between the two.

Odey complained about Hansen's statement sometime in 2014. He was not terminated until June 2015, after he falsely certified a rounds sheet and a patient was discovered missing. In order to establish causation through temporal proximity, the time between the protected activity and an adverse employment action must be "very close." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Our Court of Appeals has found that a period of two months or more between the protected activity and the adverse action defeats any claim that a causal connection exists. See Williams v. Phila. Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004); McCann v. Astrue, 293 F. App'x 848, 852 (3d Cir. 2008). Because a period of at least seven months elapsed between Odey's complaint about Hansen and his termination, we find that there is insufficient temporal proximity to establish a causal connection between the two events.[3]

There is no other evidence in the record from which a reasonable factfinder could conclude that retaliation was the cause of Odey's termination. As explained above, Odey has admitted to falsifying the 6:30 p.m. rounds sheet and such conduct constituted express grounds for immediate termination under TUH policy. Odey has not come forward with evidence that defendants provided an inconsistent explanation for his

---

3. Hansen was terminated in October 2014, and therefore we can presume that Odey's complaint about Hansen occurred before that time.

termination, engaged in a pattern of antagonism, or otherwise took any action that would suggest a retaliatory motive. See Carvalho-Grevious, 851 F.3d at 259. Odey has not produced evidence of a prima facie case of retaliation sufficient to survive summary judgment.

V

Accordingly, for the reasons stated above, the motion of defendants for summary judgment on Odey's discrimination and retaliation claims under 42 U.S.C. § 1981 will be granted.